IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                    Criminal No.:  ELH-13-476

THOMAS TINSLEY
*Defendant*.

**MEMORANDUM OPINION**

Thomas Tinsley pled guilty in April 2014 to sex trafficking of a minor, for which he is serving a sentence of 132 months' imprisonment.  *See* ECF 24; ECF 25; ECF 52.  While self-represented, he filed a motion for compassionate release (ECF 56), supported by exhibits.  ECF 56-1.  Defense counsel supplemented the motion with a memorandum of law (ECF 62), supported by seven exhibits.  *See* ECF 62-1 to ECF 62-7.  The exhibits include defendant's medical records at the Bureau of Prisons ("BOP").  ECF 62-1.  I shall refer to ECF 56 and ECF 62 collectively as the "Motion."  The government's opposition is docketed at ECF 68 (the "Opposition"), and is supported by five exhibits.  *See* ECF 68-1 to ECF 68-5.  Defendant has replied (ECF 74), and has provided another exhibit.  ECF 74-1.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

**I.  Background**

In an Indictment issued on September 10, 2013 (ECF 1), Tinsley was charged with one count of sex trafficking of a minor, in violation of 18 U.S.C.§§ 2, 1591(a).  On April 10, 2014, defendant entered a plea of guilty to the charge (ECF 24), pursuant to a Plea Agreement (ECF 25) submitted under FED. R. CRIM. P. 11(c)(1)(C).

The Plea Agreement included a "Factual Stipulation." *Id.* at 9. According to the stipulation, in May 2013, defendant "was a 27-year-old resident of Baltimore" and a "registered sex offender . . . based on a [prior] conviction involving sexual intercourse with a minor." *Id.* Around this time, Tinsley met "A.L.", a fifteen-year-old girl who had run away from home. *Id.* Tinsley "invited A.L. to live with him at the Motel 6 on Caton Avenue in Baltimore." *Id.* Thereafter, defendant "began having unprotected sexual intercourse . . . with A.L." *Id.* And, Tinsley encouraged A.L. "to engage in prostitution in order to pay for the Motel 6 hotel room and provide him with additional currency." *Id.*

"A.L. routinely met with prostitution clients in and around the Motel 6 and communicated using a cellphone with [defendant] regarding her client interactions, including the location of the commercial sex and the identity of her patrons." *Id.* Defendant "monitored A.L.'s commercial sex activities and gave her instructions regarding her client interactions, including telling her to collect cash before the commercial sex." *Id.* Moreover, Tinsley "sometimes negotiated directly with prospective clients for commercial sex on behalf of A.L." *Id.* And, "Federal agents found inside the . . . Motel 6 room [defendant's] sex offender registry paperwork, which listed the Motel 6 address as his 'place of residence.'" *Id.*

In the Plea Agreement, the parties contemplated a base offense level of 30, pursuant to Section 2G1.3(a)(2) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). ECF 25, ¶ 6(a). And, the parties agreed that the offense level was subject to a two-level increase "because the offense involved the commission of a sex act and sexual contact; and a commercial sex act," pursuant to U.S.S.G. § 2G1.3(a)(4). *Id.* ¶ 6(c). But, the parties agreed "to contest" whether "the offense involved undue influence to cause a minor to engage in prohibited sexual

conduct," so as to subject the defendant to a two-level increase in the offense level, under U.S.S.G. § 2G1.3(b)(2)(B).  *Id.* ⁋ 6(b).

The government agreed to three deductions under U.S.S.G. § 3E1.1, based on defendant's acceptance of responsibility for his criminal conduct.  *Id.* ⁋ 6(d).  Therefore, the Plea Agreement provided that Tinsley's "final adjusted offense level for the offense is either a 29 or 31 (after acceptance of responsibility)."  *Id.* ⁋ 6(e).  But, the Plea Agreement also reflected that there was no agreement as to defendant's criminal history or criminal history category.  *Id.* ⁋ 7.

Under Rule 11(c)(1)(C), the parties agreed to "a sentence within the range of months established by Guidelines level 29 or 31," and "the low-end of criminal history IV to the high end of criminal history category V."  *Id.* ⁋ 8.  This corresponds to a sentence between 121 and 210 months of imprisonment.

The Presentence Investigation Report (ECF 29, the "PSR") provided that because Tinsley "committed the instant offense (a covered sex crime) subsequent to sustaining at least one sex offense conviction, and § 4B1.1 (Career Offender) does not apply, the defendant is a repeat/dangerous sex offender within the meaning of U.S.S.G. § 4B1.5(a)."  ECF 29, ⁋ 25. Accordingly, the PSR reflected an offense level of 37, before deductions for acceptance of responsibility, *id.*, and, a corresponding Criminal History Category of VI, under U.S.S.G. § 4B1.5(a)(2).  *Id.* ⁋ 46.

Further, the PSR reflected that the defendant had six prior adult criminal convictions.  *Id.* ⁋⁋ 31-42.  In May 2002, at the age of seventeen, Tinsley was arrested on charges of burglary in the state of Georgia.  *Id.* ⁋ 31.  He was sentenced to five years' imprisonment, three of which were suspended, as well as a term of three years' probation.  *Id.*  Moreover, the PSR reflects that a "non-extradition warrant" was issued on May 5, 2005, *id.* ⁋ 31, after defendant "allegedly violated the

conditions of his probation and, as a result, "was considered an absconder." *Id.* ¶ 33. At the time the PSR was drafted, the warrant "remain[ed] active." *Id.* ¶ 31. His period of probation, therefore, was "tolled upon the warrant being signed." *Id.* ¶ 33.

In October 2006, defendant was convicted in the Circuit Court for Howard County, Maryland of attempted burglary in the first degree, conspiracy to commit burglary in the first degree, and malicious destruction of property. *Id.* ¶ 34. He was sentenced to nine months of incarceration, concurrent "with any other sentence," and "no probation." *Id.*

Less than one year later, in September 2007, defendant pled guilty to a sex offense in the third degree for having sex with a fifteen-year-old girl, Ashley Taylor, in April 2006. *Id.* ¶¶ 36-37. Defendant was sentenced to "191 days' incarceration, time served." *Id.* ¶ 36. In addition, he was required to "register as a sex offender for life, based on this conviction." *Id.* Ms. Taylor gave birth to defendant's son in December 2006. *Id.* ¶ 37.

Thereafter, defendant was twice convicted for failure to register as a sex offender. First, in August 2009, defendant failed to register as a sex offender in Anne Arundel County. *Id.* ¶ 38. He was "sentenced to 45 days incarceration," with all but time served (twenty-nine days) suspended. *Id.* And, in December 2009, defendant failed to register by the date he was required to do so. *Id.* ¶ 40. Accordingly, he was sentenced to three years' incarceration, with all but sixty days suspended, and a two-year term of unsupervised probation. *Id.* ¶ 39. Defendant's probation expired on July 26, 2013. *Id.*

Then, in April 2013, a police officer "conducted a traffic stop on a vehicle in which the defendant was a passenger." *Id.* ¶ 42. During this interaction, defendant admitted to possession of "some marijuana." *Id.* However, the officers recovered a "plastic bag of suspected cocaine" from defendant's person, "along with two baggies of suspected marijuana." *Id.* And, the officers

recovered "a grinder with suspected marijuana . . . from the vehicle's center console area." *Id.* Ultimately, defendant pled guilty to one count of unlawful possession of a controlled dangerous substance. *Id.* ¶ 41. He was sentenced to "3 days incarceration, time served." *Id.*

According to the PSR, defendant had a total of 11 criminal history points. *Id.* ¶ 43. However, two more points were added, pursuant to U.S.S.G. § 4A1.1(d), because defendant was on probation when the instant offense occurred. *Id.* ¶ 44. With 13 points (*id.* ¶ 45), defendant had a Criminal History Category of VI. *Id.* ¶ 45.

By statute, the offense carries a mandatory minimum term of imprisonment of 10 years, with a maximum of life. *See* 18 U.S.C. § 1591(b)(2); ECF 29, ¶ 57. With a final offense level of 34 and a Criminal History Category of VI, defendant's Guidelines called for a sentence ranging from 262 to 327 months of imprisonment. ECF 29, ¶ 58.

The PSR also noted that, as a child, defendant spent time in foster care. *Id.* ¶ 66. And, he has a long history of mental health conditions. *Id.* ¶ 73. In particular, the PSR reflects that defendant was diagnosed with a "mood disorder" at a young age "and started medications which helped him cope with his problems." *Id.* The records from "the Baltimore County Healthcare for the Homeless," where defendant received care between 2008 and 2012, as well as records from "PDG Rehabilitation Services, where the defendant was treated between 2009 and 2011," reflected a history of bipolar disorder, and two suicide attempts, one in 2002 and one in 2011. *Id.* i

Tinsley is the father of six children from three relationships. *Id.* ¶¶ 67, 68, 69. He "began using marijuana daily from the age of 14, until he went to jail at the age of 17," as well as daily cocaine use from the ages of 15 to 17. *Id.* ¶ 80. He also indicated that he was "prescribed oxycodone in May of 2013 and became addicted to the pain killer." *Id.* However, "he was then prescribed Tramadol . . . in July 2013, which helped him withdraw from the oxycodone." *Id.*

According to the PSR, defendant dropped out of high school.  *Id.* ⁋ 81.  Although defendant "attempted to complete his GED while incarcerated in Georgia," he was not successful.  But, he wanted to obtain his GED, and he also "expressed an interest in taking college courses, and learning an electrical trade."  *Id.* ⁋ 82.

Sentencing was held on April 10, 2015.  ECF 51; *see* ECF 66 (Transcript).  Tinsley was 30 years old at the time.  ECF 29 at 1.   Both sides submitted sentencing memoranda.  *See* ECF 35 (defendant); ECF 40 (government); ECF 49 (defense supplement).  Counsel addressed, *inter alia*, the discrepancy between the Plea Agreement and the PSR regarding defendant's offense level and criminal history category.

The government agreed that the Chapter Four enhancement was "applicable in this case," but explained that it was "one of the factors which the government negotiated-away in exchange for the teenage victim avoiding facing her aggressor in open court."  ECF 40 at 4-5, n.3.  However, the government urged the Court to apply the two-level enhancement under U.S.S.G. § 2G1.3(b)(2)(B).  *Id.* at 5-9.

Defendant objected to the repeat offender enhancement, arguing that it did "not apply . . . because the underlying conviction upon which Probation relies—a third degree sex offense from 2007—was a statutory offense based on a non-violent consensual encounter."  ECF 35 at 2.  Further, the defense urged the Court not to award the two-level enhancement under § 2G1.3(b)(2)(B).  *Id.* at 3.

The defense exhibits "reflect[ed] Mr. Tinsley's network of support in the community and also his accomplishments while incarcerated."  ECF 49.  These included certificates that Tinsley received during detention, ECF 49-1; a copy of a photograph of Tinsley with his children, ECF

49-2; and supportive letters from Tinsley's mother, his ex-wife, and his ex-girlfriend, who is also the mother of three of Tinsley's children.  ECF 49-3; ECF 49-4; ECF 49-5.

With respect to the defendant's offense level, I determined that the PSR accurately applied the Chapter Four enhancement, pursuant to U.S.S.G. § 4B1.5.  *See* ECF 66 at 16-20.  I also found that defendant's offense level was otherwise subject to a two-level increase under § 2G1.3(b)(2)(B).[1]  In this regard, I noted that "some degree of undue influence can be presumed" in this case "because of the substantial difference in age between [defendant] and the minor."  ECF 66 at 23.  Specifically, defendant was more than 12 years older than the victim.  *See* U.S.S.G. § 2G1.3, App. Note 3B.  And, I also considered that defendant "monitored the minor's commercial sex activities and gave her instructions regarding her client interactions . . . ."  ECF 66 at 24. Accordingly, after taking into consideration defendant's acceptance of responsibility, I determined that his total offense level was 34, with a criminal history category of VI.  ECF 53 at 1.

Nevertheless, I determined that a criminal history category of VI "overstated the seriousness of [defendant's] record," and I departed from the Guidelines to assign Tinsley a criminal history category of V, pursuant to U.S.S.G. § 4A1.3(b)(1).  ECF 66 at 31-32; *see* ECF 53 at 2.  This was also consistent with the "C plea," in which the parties anticipated a sentencing range based either on a Criminal History of IV or V.  ECF 25, ⁋ 9.  Given these rulings, the Guidelines called for a term of imprisonment ranging from 235 to 293 months.  And, as mentioned, pursuant

---

[1]  Given the application of the Chapter Four enhancement, the specific offense characteristics had no effect on the offense level.  In other words, without the Chapter Four enhancement, defendant would have had a base offense level of 30, and four levels would have been added because of two specific offense characteristics.  *See* ECF 29, ¶¶ 17, 18.  This would have resulted in an offense level of 34, before deductions under U.S.S.G. § 3E1.1.  *See id.*, ¶ 22. But, the Chapter Four enhancement replaced the specific offense characteristics.

to 18 U.S.C. § 1591(b)(2), defendant was subject to a mandatory minimum sentence of ten years' imprisonment. *See* ECF 29, ⁋ 57.

As indicated, under the terms of the C plea, the parties had agreed to a sentence within the range of 121 to 210 months. Pursuant to the Plea Agreement, I imposed a sentence of 132 months' imprisonment, with credit for time served in federal custody since September 11, 2013. ECF 52 at 2. Clearly, that sentence was towards the low end of the C plea range, and far below the bottom of the Guidelines range.

In the Motion, defendant submits that, at the time of filing, "he has not been accused of any disciplinary infractions in nearly 15 months, and he has not sustained any infractions in over 18 months." ECF 62 at 4. Although defendant "was charged with two disciplinary infractions in October 2019 and one in June 2019," he was found not responsible for both. ECF 62 at 4; *see* ECF 62-7 at 1. Moreover, the Motion indicates that Tinsley was "initially sanctioned in May 2019 for using alcohol or drugs," but "those sanctions were suspended following a mental health evaluation . . . ." ECF 62 at 4; ECF 62-7 at 1.

Defendant notes that these incidents occurred before Mr. Tinsley began the Residential Drug Abuse Program ("RDAP"), and "during an especially challenging year for his mental health." ECF 62 at 4. In particular, Tinsley notes that he "attempted suicide several times, including at or around the time" of these incidents. *Id.* Nevertheless, defendant was also charged with "being in an unauthorized area in December 2018 and being insolent to a staff member in July 2015." *Id.*; ECF 62-7 at 2. And, defendant was ultimately "found responsible and sanctioned" for both infractions, although he "did not lose any good time credit" for either incident. ECF 62 at 4; ECF 62-7 at 1-2.

Tinsley submits that, if released, he "would live with his mother, Demetra Bullock, and stepfather, David Bullock, at their four-bedroom home in Bremen, Georgia." ECF 62 at 7. Further, he notes that his sister lives near Bremen. *Id.* And, defendant indicates that he "would enroll in Medicaid and seek medical care from local facilities." *Id.* at 7-8. Moreover, given that "[c]ontinued substance abuse and mental health treatment are both conditions of his supervised release," defendant posits that "with help from the U.S. Probation Office, [he] would enroll in community-based treatment to maintain his sobriety and mental well-being." *Id.* Defendant also notes that, if granted permission, he "would work for his stepfather's trucking company, Bullock Transportation," as well as its "offshoot, Home for Good Inc," which was created to "train and employ formerly incarcerated people." *Id.*; *see also* ECF 56-1 at 4-5 (letters indicating job offers for defendant from Home For Good Group, Inc. and Bullock Transport, LTD). Tinsley avers that with the "training and resources" that "Mr. Bullock's company will provide," he will be able to "obtain a CDL license" and "pursue a trucking career." *Id.*

Further, the Motion provides that, while in confinement, Tinsley has "stay[ed] active and plan[ed] for release through extensive courses and programs." *Id.* at 3; *see* ECF 62-2. In particular, Tinsley notes that he "earned his GED just six months after entering the BOP." ECF 62 at 3; *see* ECF 62-2 at 1. Defendant also claims to have "completed courses in all six modules of the BOP Release Preparation Program . . . ." ECF 62 at 3; *see* ECF 62-4 at 1. And, Tinsley "completed the non-residential Sex Offender Treatment program in May 2018." ECF 62 at 3; ECF 62-4 at 2. Most recently, Tinsley began the RDAP program in July 2020. ECF 62 at 2.

Tinsley is currently serving his sentence at Terre Haute FCI.  ECF 62 at 1.[2]  He indicates

that he has a projected release date of March 7, 2022.  ECF 62 at 2; *see* ECF 62-3 at 1.  But,

publicly available records reflect that his current release date is April 17, 2023.  *See Find an*

*Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Nov. 1, 2021).  In

any event, defendant has been in federal custody for approximately 97 months to date, which

amounts to approximately 74% of his sentence, exclusive of credit for good time.

The Motion also reflects that if defendant successfully completes the RDAP program, he

will be "eligible for RDAP early release . . . on September 7, 2021 . . . ."  ECF 62 at 21; *see* ECF

62-3 at 2.  However, in the Opposition, the government provides that it "has received confirmation

from BOP counsel that the indication of eligibility for home detention in September 2021 . . . is an

error and will be corrected in BOP's records."  ECF 68 at 5.  Defendant does not contradict this

contention in the Reply, but instead posits that this his ineligibility is "based solely upon the nature

of his conviction . . . ."  ECF 74.

Tinsley submitted a request for compassionate release to the Warden on November 11,

2020.  ECF 62 at 7; *see also* ECF 68-4.  The government offers that, on December 7, 2020, a "BOP

Clinical Director responded to the request . . .  stating that the Defendant did not meet medical

criteria for compassionate release" in a memorandum directed to Warden Lammer.  ECF 68 at 4;

*see* ECF 68-5.

## II.  Standard of Review

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i)

---

[2] Defendant began his term of incarceration at Petersburg FCI.  ECF 52 at 2.  It is unclear when he was transferred from this facility but, according to the Motion, he was transferred to FCI Terre Haute from FMC Butner in February 2020, in order to participate in the RDAP "for dual diagnosis patients . . . ."  ECF 62 at 2.

provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the Director of BOP for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress enacted the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

11

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy,* 981 F.3d at 276. But, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

In resolving a compassionate release motion, a court must also consider the factors in 18 U.S.C. § 3553(a). *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (Mem.) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). And, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

However, as indicated, § 1B1.13 was last updated in November 2018, before the enactment of the First Step Act.  It is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230).

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 827.  But, compassionate release is a "rare" remedy.  *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

To be sure, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

### III.  COVID-19[3]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4] Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . presents a

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.  This is because, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).   As of November 1, 2021, COVID-19 has infected more than 45 million Americans and caused approximately 745,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 1, 2021).

Although this country saw a reduction of cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

16

But, in recent weeks, the trend has again become more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").  Even so, health authorities warn that there remain reasons for caution, because of the relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the impending holiday season, which will lead to an increase in the number of indoor gatherings, where the virus can more easily spread.  *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL &

PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. [hereinafter *Certain Medical Conditions*]. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), bronchiectasis, bronchopulmonary dysplasia (chronic lung disease affecting newborns), interstitial lung disease, cystic fibrosis, and pulmonary embolism; pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; mood disorders, including depression and schizophrenia spectrum disorder; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking (current or former); solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and, tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, the CDC cautions that the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not

made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[5]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement who have either served a certain portion of their sentence, or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has

since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 68% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 1, 2021).  And, 58% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.

As of November 1, 2021, the BOP reported that 148 out of a total 133,043 federal inmates and 351 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,747 inmates and 8,190 staff have recovered from the virus; and 266 inmates and seven staff members have died from the virus.  Moreover, the BOP has administered 239,924 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 1, 2021).

With respect to Terre Haute USP, where the defendant is imprisoned, the BOP reported that as of November 1, 2021, out of a total of 1,180 inmates, two have tested positive.  And, no staff members have tested positive for COVID-19, and 709 inmates and 26 staff have recovered at the facility. In addition, of the combined 2,481 inmates housed in either Terre Haute FCI or Terre Haute USP, 1,918 inmates, as well as 364 staff members, have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *USP Terre Haute*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/thp (last visited Nov. 1, 2021).  But, the Court has not been provided with information as to the defendant's vaccination status.

### IV.  Discussion

In the Motion, Tinsley argues that the Court should "issue an order reducing Mr. Tinsley's term of incarceration to time served and including a period of home confinement as a condition of supervised release."  ECF 62 at 1.  Specifically, defendant claims that such a reduction is necessary because he "is a former smoker who suffers from severe asthma, hypertension, and prediabetes, and he was diagnosed in 2016 with Stage 2 chronic kidney disease," all of which are conditions that "place him at serious risk of becoming severely ill from COVID-19."  *Id.* Moreover, Tinsley claims that "the Section 3553(a) factors warrant [his] compassionate release," *id.* at 17, because "a reduction of [his] sentence would not diminish the seriousness of the offense, nor would it place the public in any danger," *id.* at 21.

In its Opposition, the government asserts that the Court should deny the Motion because defendant "is not even close to serving the statutory minimum of 120 months, pursuant to 18 U.S.C. § 1591(b)(2), and has not demonstrated extraordinary and compelling reasons that would make him eligible for a sentencing reduction under the relevant guidelines policy statement."  ECF 68 at 1.  Further, the government argues that, "given the appalling nature of [defendant's] offense

and his troubling criminal and BOP record, it is clear that the Defendant continues to pose a serious danger to the community, and the relevant 18 U.S.C. § 3553(a) factors in this case do not justify the 'rare' and 'extraordinary' remedy of sentence reduction." *Id.* at 1-2 (quoting *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020)).

## A.

Tinsley is now 38 years of age.  He claims to suffer from five underlying conditions that make him particularly vulnerable to COVID-19.  ECF 62 at 1.  In particular, defendant reports that he smoked cigarettes "between 1998 and 2009, ECF 62 at 5; *see* ECF 62-1 at 59 (describing defendant as an "Ex-moderate cigarette smoker").  Further, he indicates that he suffers from "'severe,' 'persistent,' 'sub-optimally controlled'" asthma.  ECF 62 at 5 (quoting ECF 62-1 at 63).  And, defendant notes that he has been diagnosed with hypertension, for which he takes medication on a daily basis.  ECF 62 at 5-6; *see* ECF 62-1 at 41.  Defendant also indicates that he was recently diagnosed with prediabetes.  *See* ECF 62 at 6; ECF 62-1 at 5.  And, in 2016 defendant was diagnosed with Stage 2 (mild) chronic kidney disease.  *See* ECF 62 at 6; ECF 62-1 at 45.  Although defendant's medical records reflect that this "condition is resolved, as opposed to current," he asserts that "there is no cure for chronic kidney disease, only treatment to relieve its symptoms and slow its progression."  ECF 62 at 6 (internal quotation marks and citation omitted); *see* ECF 62-1 at 45.

In addition, defendant asserts that he suffers from fainting spells, the cause of which remains unclear, and a neurological condition known as occipital neuralgia.  *See* ECF 62 at 6-7.  Specifically, Tinsley submits that he went to the "emergency room/hospital" three times since March 2020, each time after experiencing fainting episodes.  *See id* at 6-7*;* ECF 62-1 at 6, 12, 21.

Defendant also notes that he had a fourth trip to the emergency room in this same time frame for a "fever and respiratory distress," after he fell ill with the flu.  ECF 62 at 7; *see* ECF 62-1 at 27.

Regarding his occipital neuralgia, defendant alleges that he has suffered from this condition for several years, the symptoms of which include "continuous aching, burning, throbbing, with intermittent shocking or shooting pain."  ECF 62 at 7 (citation and internal quotation marks omitted); *see* ECF 62-1 at 6, 81.  Defendant also notes that in November 2018 he had a spinal resection to remove a benign tumor.  ECF 62 at 7; *see* ECF 62-1 at 32.

In his *pro se* motion, defendant represents that he also has chronic obstructive pulmonary disease.  ECF 56 at 2.  However, defense counsel's supplemental memorandum did not renew this claim. *See* ECF 62.  And, defendant's medical records do not reflect this condition.  *See* ECF 62-1.

The government contends that defendant's various medical conditions do not justify his release from prison.  Specifically, it asserts that defendant's asthma and hypertension are not sufficiently serious to "provide an extraordinary and compelling reason for a sentence reduction to time served, given the lack of data establishing a link between these conditions and illness from COVID-19."  ECF 68 at 20.[6]  Moreover, the government notes that defendant's other medical issues, including his prediabetes, recurring fainting spells, and occipital neuralgia, have not been recognized by the CDC as "carrying any increased risk with respect to COVID-19."  *Id.* at 21.

---

[6] In making this argument, the government relies on a prior iteration of the CDC's guidance, which indicated that those with certain conditions, such as asthma and hypertension, *might* face an increased risk of severe illness from COVID-19, whereas those with other conditions, such as a history of smoking or chronic kidney disease, *are* at increased risk of severe illness from the virus.  *See* ECF 68 at 19.  This guidance has since been updated to reflect the language I described, *supra*.

In the government's view, chronic kidney disease and a history of smoking can, in certain circumstances, be sufficiently serious to create an extraordinary and compelling reason to justify a prisoner's release, but the conditions do not warrant release in Tinsley's case.  First, the Opposition implies that defendant's history of smoking should have no bearing here because "the only of evidence of defendant's smoking history is self-reported and the Defendant claims to have stopped smoking over a decade ago."  *Id.* at 19-20.  Furthermore, the government points out that defendant's "medical record notes a 'mild' case of chronic kidney disease that has been 'resolved' since 2017."  *Id.* at 20 (quoting ECF 62-1 at 45).  Consequently, in the government's view, this condition "does not appear to be a current health problem" and thus cannot render defendant eligible for compassionate release.

In my view, Tinsley has the better of the argument.  As explained, the latest guidance from the CDC instructs that defendant's asthma, hypertension, chronic kidney disease, and history of smoking render a person "of any age . . . more likely to get severely ill from COVID-19.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, Oct. 14, 2021, https://bit.ly/38S4NfY.  Moreover, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *Id.*

And, to the extent that the government is suspect about the self-reported nature of defendant's smoking history, defendant's decade-long history of smoking is supported by the fact that he told his doctor of this condition in September 2020, before filing his *pro se* motion for compassionate release with this Court.  *See* ECF 62-1 at 59; ECF 56.  In fact, defendant's history of smoking was raised by defense counsel in the supplemental memorandum submitted to the Court in January 2021.  ECF 62 at 5, 9-10.  In any event, I see no reason to doubt the veracity of defendant's assertion on this point.

In addition, according to the CDC's latest guidance, mood disorders, including depression and schizophrenia spectrum disorders, "can make you more likely to get severely ill from COVID-19. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, Oct. 14, 2021, https://bit.ly/38S4NfY. And, as reflected in the record, Tinsley has long-standing and severe mental health issues, including bipolar disorder, major depressive disorder, and multiple suicide attempts. *See* ECF 62 at 4; ECF 62-1 at 79-80, 87; *see also* ECF 29, ⁋ 73 (reflecting a reported history of bipolar disorder).

Accordingly, I am persuaded that Tinsley's history of smoking, coupled with his mental health and medical issues, amount to an extraordinary and compelling circumstance that would warrant eligibility for early release from prison. However, I cannot conclusively make this determination, because the Court has no information as to defendant's COVID-19 vaccination status.

As Judge Gallagher observed: "[T]he highly effective available vaccines dramatically alter whether an inmate's medical conditions constitute the 'extraordinary and compelling reason' required to further consider compassionate release." *United States v. Harris*, SAG-05-61, 2021 WL 1516012, at *2 (D. Md. Apr. 16, 2021). And, courts have found that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim of susceptibility to the effects of COVID-19 as a ground for compassionate release. *See e.g.*, *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see also United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–*4 (D.D.C. May 24, 2021) (noting that the defendant had "the advantage of being represented—and informed of the benefits of vaccination—by counsel," and that by exercising his right to refuse vaccination, the defendant "endanger[ed] himself and those around him"); *United States v. Smith*, SAG-20-47, 2021 WL

1733457, at *2 (D. Md. May 3, 2021) (denying defendant's motion for compassionate release on the grounds that the defendant refused the vaccine even though he did not have any "medical contraindications for vaccination").

Understandably, the parties' briefing does not address defendant's vaccination status because, at the time of the submissions, the COVID-19 vaccines were not widely available. *See* Christopher Rowland, *Why Your Grandparents Can't Find Vaccines: Scarcity of Niche BioTech Ingredients*, WASH. POST, Feb. 18, 2021, https://www.washingtonpost.com/business/2021/02/18/vaccine-fat-lipids-supply/. Because the delay in resolution of the Motion is not attributable to the defendant, and to avoid further delay, I shall assume that defendant is either vaccinated or not opposed to vaccination. In that light, defendant's physical and mental health conditions readily satisfy the "extraordinary and compelling" prong of the § 3582 analysis. That determination does not end the inquiry, however.

### B.

To be sure, the coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements;

(5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

In its Opposition, the government argues that the Court should deny the Motion because defendant remains a danger to the community, under the factors in 18 U.S.C. § 3142(g).  It also cites U.S.S.G. § 1B1.13(2) cmt. n.1.  *See* ECF 68 at 23.  However, as explained, the Fourth Circuit has said that U.S.S.G. § 1B1.13 applies only where a BOP official brings a motion for compassionate release on behalf of a defendant.  *See McCoy*, 981 F.3d at 281-82; *Kibble*, 992 F.3d at 330-31.  In any event, 18 U.S.C. § 3553(a)(2)(C) requires the Court to consider whether the sentence imposed is necessary to "protect the public from further crimes of the defendant."

Regarding the § 3553(a) factors, defendant's offense was undeniably serious.  As described above, defendant trafficked and had unprotected sex with a fifteen-year-old girl.  ECF 25 at 9.  Tinsley "encouraged A.L. to engage in prostitution in order to pay" for the motel room where defendant and the minor resided.  *Id.*  He monitored these "commercial sex activities and gave [A.L.] instructions regarding her client interactions . . . ."  *Id.*  And, in some instances, he "negotiated directly with prospective clients on behalf of A.L."  *Id.*

The Court acknowledges, as defendant argues, that Tinsley's conduct was limited in time and scope.  *See* ECF 62 at 17 (noting that Tinsley's conduct lasted about two weeks, "did not entail multiple victims, inter- or intrastate transport of the victim, online or other advertisements to solicit customers, the production of images or videos of the victim, physical abuse of the victim, nor significant profit beyond the cost of a shared motel room").  Ultimately, however, the fact that defendant's conduct could have been worse does little to detract from the reality that defendant sexually exploited a teenage girl.  *See* ECF 66 at 54.

Furthermore, as the government points out, Tinsley's offense of conviction "was not an isolated incident." ECF 68 at 26. To say nothing of defendant's earlier convictions for burglary in 2002 and attempted burglary in 2006, *see* ECF 29, ¶¶ 31-34, Tinsley has previously been convicted of unlawful sexual contact with a minor. *Id.* ¶¶ 36-37. And, although he was thereafter required to register as a sex offender, he has twice been convicted for failing to do so. *Id.* ¶ 36, 38-40. In fact, defendant committed the instant offense while on probation for his second conviction for failure to adhere to this requirement. *Id.* ¶ 44. In sum, it appears that defendant's experiences with imprisonment and probation have not previously deterred him from engaging in serious criminal conduct.

And, defendant's disciplinary record during his term of imprisonment cautions against his release. Tinsley has been found guilty of infractions since he was convicted, including insolence towards BOP staff in July 2015 and being in an unauthorized area in December 2018. *See* ECF 62-7.[7] Moreover, in August 2020 BOP staff assessed "the Defendant to have a high risk level for recidivism." ECF 68 at 29; *see* ECF 62-4 at 2.[8]

---

[7] As described, defendant informs the Court that "[a]lthough he was initially sanctioned in May 2019 for using alcohol or drugs, those sanctions were suspended following a mental health evaluation by Psychology Services." ECF 62 at 4; *see* ECF 62-7 at 1.

[8] On July 19, 2019, the Department of Justice released a risk assessment tool, known as PATTERN, as required by 18 U.S.C. § 3632(a). *The Attorney General's First Step Act Section 3634 Annual Report*, OFF. OF THE ATT'Y GENERAL, DEP'T OF JUSTICE, https://bit.ly/3EDlDhc (December 2020), 4 [hereinafter 2020 Annual Report]. Among other things, PATTERN was designed to evaluate "the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism," as well as to "reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison." 18 U.S.C. §§ 3632(a)(1), (4).

Accordingly, by January 15, 2020, "PATTERN recidivism risk assessment levels of High, Medium, Low, or Minimum were assigned to all sentenced inmates at BOP designated facilities." 2020 Annual Report, *supra*, at 7. And, as described in the Attorney General's Annual Report, "a

Defendant points out that, as of January 2021, he had not "sustained any infractions in over eighteen months." ECF 62 at 4. Furthermore, the Court understands that defendant experienced significant struggles with his mental health in 2019 and, since that time, he has benefitted from mental health treatment and his mental health has "stabilized." *Id.* But, in light of the entirety of Tinsley's disciplinary record, I am not persuaded that a compliant record for eighteen months militates in favor of defendant's release from prison.

To be sure, defendant has served approximately three-quarters of his sentence. But, that does not paint a complete picture. The sentence itself was substantially below the bottom of the Guidelines (ECF 52; ECF 53 at 1-2) and towards the bottom of the C plea range. ECF 25, ⁋ 9.

Moreover, the time that defendant has served to date is more than twenty months below the ten-year mandatory minimum sentence that Congress thought appropriate. *See* ECF 29, ⁋ 57; *see also* 18 U.S.C. § 1591(b)(2). Invoking this Court's decision in *United States v. Holloway*, ELH-09-363, 2020 WL 5893639 (D. Md. Oct. 5, 2020), defendant correctly points out that the Court need not deny the Motion on this basis. *See* ECF 74 at 14-15. Nonetheless, the ten-year mandatory minimum's applicability in this case is instructive insofar as it indicates the kind of sentence that Congress believes to be necessary to reflect the seriousness of defendant's conduct.

Tinsley adds that when evaluating whether his punishment to date adequately reflects the seriousness of his conduct, the Court should consider that he will be required to register as a sex offender upon his release from prison and, thus, will "continue to pay significant consequences for his conduct for the rest of his life." ECF 62 at 17-18. But, as the government notes, Tinsley "was

---

review of each inmate's recidivism risk score is conducted at his or her regularly scheduled Program Review," which occurs "every 180 days throughout the inmate's term of incarceration, or every 90 days once the inmate has less than a year to serve on his or her sentence." *Id.* at 30-31.

already under this requirement due to a prior sex offense against a minor."  ECF 68 at 31-32; *see* ECF 29, ⁋ 36.  And, he flouted the law.

In sum, the Motion establishes that Tinsley has accepted responsibility for his actions and that he is committed to his continued rehabilitation.  *See*, *e.g.*, ECF 62 at 3-4, 18-19; ECF 74 at 9-10, 14-15.  Moreover, the Court is encouraged that defendant has assembled a promising re-entry plan, made possible, in no small part, by the support Tinsley enjoys from his family.  *See* ECF 62 at 7-8; ECF 62-5; ECF 62-6.  But, given Tinsley's criminal history, the seriousness of the instant offense, his disciplinary record, and the time in prison Tinsley has served to date, I am of the view that his release from prison is not warranted at this juncture.

## V.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 56), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: November 2, 2021                                    /s/
                                              Ellen L. Hollander
                                              United States District Judge